IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANDY O. TROTTER,

              Petitioner,                   No. 2: 10-cv-0996 FCD KJN P

   vs.

R. LOPEZ,

              Respondent.           FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 2007, a jury found petitioner guilty of two counts of attempted murder with premeditation and deliberation (Cal. Penal Code § 664/187(a)) (counts one and two), discharging a firearm from a motor vehicle at another person other than an occupant of a motor vehicle (Cal. Penal Code § 12034(c) (count three), and shooting at an inhabited dwelling (Cal. Penal Code § 246) (count four).  The jury further found that the crimes were committed for the benefit of a criminal street gang with the intent to promote, further and assist in criminal conduct by gang members (Cal. Penal Code § 186.22(b)(1)).  Regarding counts one and two, the jury also found that petitioner intentionally discharged a firearm within the meaning of California Penal Code § 12022.53(c).

1

1    Petitioner is serving a sentence of life with the possibility of parole.

2    This action is proceeding on the original petition filed April 26, 2010, as to the

3    following claims:  1) the trial court's evidentiary rulings violated due process as well as

4    petitioner's right to present a defense (3 claims); 2) alleged insufficient evidence; and 3) alleged

5    ineffective assistance of counsel.[1]

6    After carefully considering the record, the undersigned recommends that the

7    petition be denied.

8    II.  Standards for a Writ of Habeas Corpus

9    An application for a writ of habeas corpus by a person in custody under a

10   judgment of a state court can be granted only for violations of the Constitution or laws of the

11   United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

12   interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

13   Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

14   Federal habeas corpus relief is not available for any claim decided on the merits in

15   state court proceedings unless the state court's adjudication of the claim:

16       (1) resulted in a decision that was contrary to, or involved an
17       unreasonable application of, clearly established Federal law, as
         determined by the Supreme Court of the United States; or

18       (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
19       State court proceeding.

20   28 U.S.C. § 2254(d).

21   Under section 2254(d)(1), a state court decision is "contrary to" clearly

22   established United States Supreme Court precedents if it applies a rule that contradicts the

23   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

24   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at a different

25

26   _____
     [1]  The original petition raised three additional claims which petitioner voluntarily
     dismissed as not exhausted.  (See Dkt. Nos. 9, 10.)

result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal citations omitted) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Harrington, 131 S. Ct. at 784-85 (2011).  That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

1  decision is available, the habeas petitioner has the burden of "showing there was no reasonable

2  basis for the state court to deny relief. Harrington, 131 S. Ct. at 784. "[A] habeas court must

3  determine what arguments or theories supported or, . . . could have supported, the state court's

4  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

5  arguments or theories are inconsistent with the holding in a prior decision of this Court. Id. at

6  131 S. Ct. at 786.

7  III.  Factual Background

8          Respondent's answer contains a factual summary of petitioner's offenses.  After

9  independently reviewing the record, the undersigned finds this summary to be accurate and

10  adopts it below.

11          At approximately 10:30 p.m. on April 12, 2005, Rasheed Washington drove from

12  his grandmother's house to Elm Street, between Grand Avenue to the south and Harris Avenue to

13  the north, in the Del Paso Heights section of Sacramento to meet up with his cousin, Dellanthony

14  Bradford, and a friend, Ivory King.  (Reporter's Transcript, Volume 1 ("1 RT") at 90-95, 124,

15  146-47.)  When Washington arrived, he stopped his car in the middle of the street facing south

16  toward Grand Avenue, while Bradford's car was parked facing north toward Harris Avenue.

17  Bradford came over to the driver's side of Washington's car to talk with him while King

18  remained seated in the passenger seat of Bradford's car listening to music.  (1 RT at 97-98, 124-

19  29, 149-50.)

20          Washington and Bradford had been talking in the street for about five minutes

21  when a dark-colored car with a white top drove by heading south toward Grand Avenue.  (1 RT

22  at 102-04, 129-31, 150-52, 259.)  Right after the car went past, Washington heard gunshots and

23  saw flames and a gun sticking out from the rear window on the passenger side of the car.  (1 RT

24  at 101-05.)  Washington put his car in reverse and sped backward down the block, while

25  Bradford ran from the scene.  (1 RT at 105-06.)  When it looked like the car was gone,

26  Washington drove back down the street and started looking for his cousin.  (1 RT at 106.)

King, who had also heard the gunshots, leaned over from the passenger seat, put Bradford's car in gear, turned the steering wheel, and pressed the gas pedal with one of his hands to get away. (1 RT 128-32.) After reaching the corner of Elm Street and Harris Avenue, King moved over to the driver's seat, turned the car around and drove back to where the shooting had occurred. (1 RT at 132-33.)

When Bradford heard shots, he took off running through a field and then down an alley toward Harris Avenue. (1 RT at 150, 153.) As he was running, Bradford realized that he had been shot. (1 RT at 154.) Within a couple of minutes, Bradford heard police sirens and saw police lights, and he headed back to Elm Street holding his right hand, which had been hit by a bullet and was bleeding. (1 RT at 108-09, 130, 135, 154-58.) Bradford laid down on the ground in the front yard of the house at 3813 Elm Street where brothers Brandon Boyer and Greg Speece lived. (1 RT at 109-10, 243, 349; 2 Reporter's Transcript ("2 RT") at 530-31.)

At the time of the shooting, Officer John Hosmer of the Sacramento Police Department was just around the corner in his police car in the parking lot of the Grand High School Police Department, located on the north side of Grand Avenue between Huron and Elm Streets and south of Harris Avenue. (1 RT at 164-65.) Hosmer heard what sounded like five to ten gunshots in rapid succession coming from east of his location. (1 RT at 166, 169.) Therefore, with all the lights to his vehicle turned off, Hosmer pulled his patrol car to the front entrance of the parking lot where he had an unobstructed view to the east and west down Grand Avenue. (1 RT at 166.)

Within a matter of seconds of hearing the gunshots, Hosmer saw car headlights coming south down Elm Street toward Grand Avenue. (1 RT at 167.) Hosmer observed the car turn westbound on Grand Avenue and then northbound on Huron Street. (1 RT at 167.) At that point, Hosmer turned on the headlights for his car and started following the vehicle. (1 RT at 168.) As Hosmer was trying to catch up with the car, it pulled over and parked in front of a residence at 3840 Huron Street. Two black males wearing dark clothing (i.e., black, dark blue, or

dark green) got out of the vehicle and walked to the south side of the home by the fence.  (1 RT at 168, 171.)  One of the men appeared to have a long object in his hand.  (1 RT at 170.)  After tossing the long object over the fence, both men climbed over the fence.  (1 RT at 171.)

Hosmer reported, via radio, that the two men were fleeing eastbound from that location.  He then drove up Huron Street to Harris Avenue and proceeded into the alley between Huron and Elm streets.  (1 RT at 173.)  Hosmer shined his light down the alley and saw a black male climbing over the back fence of the residence at 3841 Elm Street, knocking down a few fence boards in the process.  This person "match[ed] somewhat" the description of the two men Hosmer had seen in front of the residence at 3840 Huron Street (1 RT at 173-74.)

In an effort to try and contain the two fleeing suspects as best as he could until the other units arrived, Hosmer proceeded to the intersection of Elm Street and Harris Avenue and waited to see if anyone "popped out on the street at that point."  (1 RT at 174, 177.)  Hosmer waited for 30 to 60 seconds, but he did not see anyone appear.  (1 RT at 176.)  He then went back and shined his spotlight down the alley again for another 30 to 60 seconds, but Hosmer did not see anyone.  However, when Hosmer returned to the intersection of Elm Street and Harris Avenue, he saw co-defendant Adams squatted down on the sidewalk.  (1 RT at 177-78.)  Hosmer asked Adams what he was doing, and Adams told the officer that he had just been shot at.  (1 RT at 178.)

Hosmer then headed back to the alley for a third time.  This time because the perimeter was set up and the area was contained, Hosmer got out of his vehicle and headed southbound through the alley with his flashlight, looking in the backyards of the adjoining homes.  (1 RT at 179.)  In the yard at 3840 Huron Street where Hosmer had observed the two men jump the fence and the one man toss a long object over the fence, he spotted a rifle in the southwest corner of the yard.  (1 RT at 179-80.)

Hosmer went into the yard and retrieved a .22 Lightning rifle along with a black jacket that was on the ground about 10 feet away from the gun.  (1 RT at 180, 272.)  Hosmer

6

checked to see if the rifle was loaded and found a live round in the chamber.  (1 RT at 185.)  As Hosmer was securing the weapon, the sheriff's helicopter that was overhead at the time, asked Hosmer over the radio if there were any plainclothes officers in the yard with him.  The officers in the helicopter then told Hosmer that there was another person in the yard on the north side of a shed.  (1 RT at 185-86.)

Around that time, Officer Randy Lozoya and his partner, Orland Morales, responded to Hosmer's call and went to 3840 Huron Street where they found a late model white over blue Chevrolet Caprice against a chain link fence.  (1 RT at 260-61, 292.)  The car's engine was still running.  (1 RT at 262, 292.)  Lozoya and Morales rushed into the backyard through the gate on the north side of the house and, along with Hosmer, they approached the shed in the yard.  The officers spotted petitioner, who had been hanging onto the fence, sweating and seemingly exhausted, and ordered him to get down on the ground, and then they arrested him.  (1 RT at 185-86, 262-63, 266-67, 292-94.)  Petitioner's hands were covered in what appeared to be bodily fluids, and, after he was taken to the patrol car, Morales saw petitioner make physical movements like he was vomiting on more than one occasion.  (1 RT at 294-95.)  However, Hosmer was not able to positively identify either petitioner or Adams as the two men who jumped out of the car and hopped the fence into the backyard of the house at 3840 Huron Street.  (1 RT at 187.)

When Lozoya was leaving the backyard through the gate, he saw a .38 snub nose revolver laying on the grass to the north side of the driveway in the front yard.  (1 RT at 266, 269.)  Lozoya examined the weapon and noticed that it contained four empty shell casings.  (1 RT at 267-68.)

Officer Keith Hoversten and his partner arrived on the scene within about one minute and took up a position on the perimeter of the area near the corner of Grand Avenue and Elm Street.  (1 RT at 252.)  Almost immediately, a group of people flagged down the officers and told them that someone (Bradford) had been shot and that the victim was at a house on Elm Street.  (1 RT at 242.)  The officers then went to that location.  (1 RT at 242-43.)  Hoversten

1    asked Washington if he had seen what happened and if he knew who had shot at them.

2    Washington told the officers that "he figured it was probably the Nogales Crips because there

3    had been a feued going on over the last few months between Nogales and Elm Street." (1 RT at

4    246.)

5             Sergeant Pamela Seyffert also responded to Hosmer's call.  When she arrived at

6    the intersection of Elm Street and Harris Avenue, she encountered Adams crouched down in a lot

7    of unkempt weeds or grass in the yard of the house on the southwest corner.  (2 RT at 301-03,

8    585, 590-92.)  From the moment Seyffert first spotted Adams in the light from her patrol car's

9    headlights, he looked "kind of shocked" and "nervous."  (2 RT at 303.)  Seyffert pulled over and

10   searched Adams for weapons before placing him in the backseat of her patrol car, without

11   handcuffs, while she ran computer checks on the name he had provided to her.  (2 RT at 302-04.)

12   While Seyffert was running those checks, she heard noises which sounded like Adams was

13   "shuffling his feet around a lot" in the back passenger compartment.  (2 RT at 304.)

14   Subsequently, Adams was moved to another police car, and Officer Tim McMahan transported

15   him to the Hall of Justice to be interviewed.  (2 RT at 304-05, 331.)

16             Immediately after Adams was transferred to McMahan's police vehicle, Seyffert

17   searched the back passenger compartment of her patrol car.  (2 RT at 306.)  Seyffert found what

18   looked like a baby's sock shoved between the Plexiglass and the steel cage at foot level.  (2 RT at

19   308.)  Inside the sock, Seyffert found two .40 caliber Speer model bullets.  (2 RT at 308-10.)

20             Later that night, Officer Mitchell Marquez found three expended shell casings in

21   the middle of Elm Street just south of the driveway to the home at 3813 Elm Street.  (1 RT at

22   251.)  One of the casings was a .40 caliber casing manufactured by Speer.  (1 RT at 255-56.)  The

23   other two were .22 caliber casings with the letter "C" stamped on them.  (1 RT at 256-57.)

24   Marquez also found a bullet hole in the trunk of Bradford's car.  (1 RT at 157-59, 258.)

25   Additionally, during the search of the backyards along the alley, the police also found a loaded

26   Sig .40 caliber handgun near the gate in the southeast corner of the yard at 3837 Elm Street, the

                                                8

house just to the south of 3841 Elm Street.  (1 RT at 189-90.)

Tanya Atkinson, an identification technician for the Crime Scene Investigations Unit, tested both petitioner and Adams for gunshot residue.  (2 RT at 354-55.)  She recalled that petitioner had bodily fluid, which she believed was mucous, on his hands when she tested him, and she did her best to "work around" the fluid.  (2 RT at 356, 363.)

Kathleen Modeste, who worked in forensic identification for the police department, lifted six fingerprints from the Chevrolet Caprice found in front of the house at 3840 Huron Street.  (2 RT at 369-71.)  Modeste also tested the car for gunpowder residue, and she found a bullet casing on the left rear floorboard of the car.  (2 RT at 371-74, 379-80.)

At the police station, investigators examined two cell phones that had been recovered at the scene.  (2 RT at 338-48.)  One phone, a Samsung model, had been recovered from Adams and was included in his property bag that had been taken to the station by McMahan.  (1 RT at 274-75; 2 RT at 333, 340.)  While at the station, Adams told the police that the phone number for his cell phone was 912-7436.  (2 RT at 340-41.)  The police checked the outgoing call log for this phone and found that a call had been made at 9:30 p.m. on April 12, 2005, to the telephone number of 289-8391, which turned out to be petitioner's cell phone number.  (2 RT at 341, 343, 346, 498-99.)  Police also discovered that earlier the same evening, at 5:44 p.m., a text message had been sent to petitioner's phone which read, "what's up, Crip?" (2 RT at 346.)

Petitioner's cell phone, a Nokia model, had been found in one of the pockets of the black jacket that Hosmer found by the .22 Lightning rifle in the backyard of 3840 Huron Street.  (1 RT at 180, 272-73; 2 RT at 343.)  Police verified that the phone number for this cell phone was 289-8391, the same number noted in the call log for Adams' cell phone at 9:30 p.m. on April 12, 2005.  (2 RT at 347, 499.)  The incoming log for this phone listed a call from Adams' cell phone at 9:31 p.m. on April 12, 2005.  (2 RT at 347-48.)  Additionally, the name listed on this cell phone was "RAH 1."  (2 RT at 348.)

1         At trial, Edward Pollack, a criminalist with the Sacramento County Crime

2   Laboratory, was qualified as an expert witness regarding the testing and analysis of gunshot

3   residue.  (2 RT at 397.)  Characteristic gunshot residue particles were found as follows: in

4   multiple locations within the Chevrolet Caprice (i.e., the steering wheel, and all four doors) (2

5   RT at 416-21); on three separate areas of the black coat that was found in the backyard of the

6   house at 3840 Huron Street (2 RT at 421-24); and, a long-sleeved T-shirt and sweat shirt that

7   were taken from Adams.  (1 RT at 275; 2 RT at 425-28.)

8         Michael Saggs, another criminalist with the Sacramento County Crime

9   Laboratory, was qualified as an expert witness regarding firearm and tool mark analysis.  (2 RT

10  at 470.)  Saggs determined that the bullet casing Modeste found on the left rear floorboard of the

11  Chevrolet Caprice was discharged in the .22 caliber Lightning rifle that Hosmer found in the

12  backyard at 3840 Huron Street.  (2 RT at 475-79.)   Saggs also conclusively determined that one

13  of the expended .22 caliber shell casings found by Marquez in the middle of Elm Street was

14  discharged in the .22 caliber Lightning rifle.  (1 RT at 256-57; 2 RT at 479-80.)  Regarding the

15  other .22 shell casing found by Marquez, Saggs was not able to make a conclusive identification.

16  However, the marks were "very suggestive that the cartridge was discharged" by that gun, and

17  Saggs testified that the second expended .22 caliber casing from the street "was probably

18  discharged in the [.22 caliber lightning] rifle" found by Hosmer.  (2 RT at 483-84.)

19        Saggs also examined and tested the .40 caliber semiautomatic handgun that was

20  found near the gate in the southeast corner of the yard at 3837 Elm Street.  (1 RT at 189-90; 2 RT

21  at 480-82.)  Saggs compared test rounds fired from that gun to the expended .40 caliber casing

22  found by Marquez in the middle of Elm Street.  He concluded that the expended casing found by

23  Marquez had been discharged by the .40 caliber handgun found by the police that night.  (2 RT at

24  481-82.)

25        In addition, Saggs examined the bullet that had been surgically removed from

26  Bradford's hand and determined that it was a .38 caliber bullet.  (1 RT at 157; 2 RT at 487-88.)

1   When asked if he could identify the manufacturer of the bullet, Saggs indicated that it was

2   consistent with some ammunition produced by Winchester, and he could not identify any other

3   possible manufacturers.  (2 RT at 489.)  Saggs also noted that the ammunition inside of the .38

4   caliber snub nose revolver found by Lozoya was produced by Winchester.  (1 RT at 266-69; 2 RT

5   at 489-90.)

6           Adlert Robinson, a former 30 year veteran of the Sacramento Police Department

7   and a current investigator with the Sacramento County District Attorneys Office, who spent 11

8   years as a detective with the Sacramento Police Department's Gang Suppression Unit, was

9   qualified to testify as an expert witness regarding gangs.  (2 RT at 500, 511.)  According to

10  Robinson, the Bloods and the Crips are both criminal street gangs, composed primarily of

11  African Americans, that started in the late 1970s or early 1980s in Southern California and that

12  migrated to the Sacramento area in the mid 1980s.  (2 RT at 511, 514.)  As Robinson explained,

13  Bloods and Crips are really "umbrella groups" that consist of several smaller gangs that are

14  usually divided by neighborhoods, or even particular streets (i.e., Oak Park Bloods, Del Paso

15  Heights Bloods, Meadowview Bloods, Nogales Gangster Crips, 29th Street Crips and Valley

16  High Gangster Crips).  (2 RT at 512-13.)

17          Regarding the Del Paso Heights Bloods, Robinson indicated that there are actually

18  even smaller groups (i.e., "a subset of a subset") of gang members, including a subset known as

19  the Elm Street Bloods.  (2 RT 515-16.)  Robinson estimated that there were approximately 30

20  validated members of the Elm Street Bloods in April 2005 and that the vast majority of those

21  gang members lived around the area of Elm Street and Grand Avenue.  (2 RT at 516.)

22          Another gang, the Nogales Gangster Crips, controlled an area that was about a

23  quarter mile away from the "turf" occupied by the Elm Street Bloods.  (2 RT at 516.)  In April

24  2005, there were 20 validated members of the Nogales Gangster Crips.  (2 RT at 520.)

25  According to Robinson, over the years, these two gangs would interact peacefully with each other

26  for periods of time, but occasionally a conflict would arise between the two gangs, which would

1    then lead to a "war" (i.e., acts of violence, including murder) between the gangs.  (2 RT at 516-
2    17, 521.)

3              For example, on November 29, 2002, Jovon Jordan, a Nogales Gangster Crip,
4    pulled out a handgun and shot and killed two members of the Del Paso Heights Bloods after a
5    verbal altercation at a pizza parlor.  (2 RT at 522.)  As another example, in or around May 2000,
6    three members of the Nogales Gangster Crips got into a fight at school with some members of
7    the Del Paso Heights or Elm Street Bloods.  A few days later, the Crips located a person who was
8    known to be in the company of Del Paso Heights or Elm Street Bloods, but who was not a
9    validated gang member himself.  The Crips shot and killed this person while he was sitting in his
10   car.  (2 RT at 523.)

11             In January 2005, another incident occurred that caused a "war" between the gangs
12   where "they were shooting back and forth at each other."  (2 RT at 528-29.)  Specifically, a
13   member of the Nogales Gangster Crips known as Baby Rah Rah was shot and killed during an
14   alleged drug deal that had gone bad.  (2 RT at 528.)  The word on the street was that the Elm
15   Street Bloods were responsible for Baby Rah Rah's death.  (2 RT at 528-29.)  According to
16   Robinson, because of the gang culture, the Crips then needed to retaliate in order to avoid
17   sending a message to other gangs that they were weak and could be taken advantage of.  (2 RT at
18   529-30.)  Between January 2005 and April 2005, four known drive-by shootings occurred in the
19   neighborhoods of Nogales and Elm Street.  (2 RT at 530.)

20             Robinson testified that Brandon Boyer and Greg Speece, who lived at the house at
21   3813 Elm Street where Bradford went after being shot, were both members of the Elm Street
22   Bloods.  (2 RT at 530-31.)  Robinson also indicated that Adams had been a self-admitted
23   member of the Nogales Gangster Crips since 1991 and that another self-admitted member of that
24   gang, Kenyatta Hudson, identified both petitioner and Adams as members of the Nogales
25   Gangster Crips in 1993.  (2 RT at 532-33.)  In addition to naming petitioner and Adams as gang
26   members, Hudson also told the police their gang monikers.  Hudson indicated that petitioner was

1 known as Mr. Magoo and Adams was called Rah Rah.  (2 RT at 533, 536.)

2       Robinson also testified about the gang tattoos on Adams' body.  Specifically,

3 Adams had the following tattoos: 1) the word "Nogales" was tattooed across his upper back; 2)

4 the word "Crips" was tattooed across his lower back; 3) a picture of a person with "Rah Rah"

5 below it was tattooed on his left arm; and 4) a picture of a person holding guns and a "rest in

6 peace" roll call list with the street monikers (i.e. "Big Happy," "Cig Head" and "Tiny Loc") and

7 dates of birth and death of former gang members who had died in the past.  The tattoo also had

8 an "NC" on it for Nogales Crips.  (2 RT 534-35.)

9       Regarding petitioner, both the Sacramento Police Department and the California

10 Statewide Law Enforcement Agency had him listed as a member of the Nogales Gangster Crips,

11 and both agencies knew his moniker was "Mr. Magoo."  (2 RT at 536.)  As for the tattoos,

12 petitioner had the following markings: 1) the word "Nogales" was tattooed across his chest; and

13 2) the letter "N" for Nogales on one arm, and the letter "C" for Crips on the other arm.  (2 RT at

14 536-37.)

15       In Robinson's expert opinion, the shooting in this matter was done for the benefit

16 of the Nogales Gangster Crips.  (2 RT at 537.)  The fact that the shooting was a drive-by played a

17 big roll in Robinson's determination.  The same is also true of the fact that the victims were

18 parked basically in front of the Boyer-Speece residence, that Robinson indicated was "basically a

19 secondary hang out for the Elm Street Bloods."  (2 RT at 538.)  Robinson further indicated the

20 fact that the crime occurred in the heart of the Elm Street Bloods' territory benefitted the Nogales

21 Gangster Crips because it showed that the Crips were "not afraid to go into another rival's

22 neighborhood to take care of what they intend[ed] to do or try to find someone or a target who

23 they want to get.  It shows that they have no fear of Elm Street."  (2 RT at 539.)

24 ////

25 ////

26 ////

IV.  <u>Discussion</u>

     A.  <u>Claim 1:  Alleged Evidentiary Errors</u>

     *Exclusion of Evidence re: Pending Charges Against Victim*

     Petitioner argues that the trial court violated his right to due process and his right to present a defense by excluding evidence that victim Bradford had pending felony charges for making criminal threats and pimping.  The California Court of Appeal denied this claim for the reasons stated herein:

> In any event, the trial court's ruling was well within its discretion. Even if defendants sought to introduce this evidence to demonstrate motive, a noncharacter purpose permissible under Evidence Code section 1101, the trial court acted well within its discretion in excluding the evidence under Evidence Code section 352.
>
> "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]" (<u>People v. Rodrigues</u> (1994) 8 Cal.4th 1060, 1124.) The court's determination "'will not be overturned on appeal in the absence of a clear abuse of that discretion, upon a showing that the trial court's decision was palpably arbitrary, capricious, or patently absurd, and resulted in injury sufficiently grave as to amount to a miscarriage of justice.'" (<u>People v. Lamb</u> (2006) 136 Cal.App.4th 575, 582.)
>
> Defendants assert that evidence of D.B's pending felony charges was relevant to suggest a nongang-related reason for the shooting. However, the pending charges arose in the fall of 2006, more than one year after the shootings at issue in this trial, and the probative value of this evidence was nonexistent: an event occurring after the shootings sheds no light on the reason for the shootings. Defendants would have to argue that if D.B. was charged with being a pimp who made criminal threats in the fall of 2006, he might have been engaging in the same conduct in August 2005. There is no evidence to support such a theory. That link is, at best, highly speculative and borders on impermissible character evidence.
>
> The trial court acted well within its discretion in concluding that this evidence would confuse the jury and that its potential for prejudice exceeded its probative value.  Even if we were to conclude that the trial court misunderstood the reason for which the evidence was being offered, that error was harmless. Given the lack of probative value of the pending charges, the trial court

14

1         would have been compelled to reach the same conclusion when
2         weighing admissibility under Evidence Code section 352.

3  (Respondent's Lodged Document 6, at 5-6.)

4         A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis

5  of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d

6  1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is

7  unavailable for alleged error in the interpretation or application of state law.  Middleton v. Cupp,

8  768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

9  Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be used to try state

10  issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

11         The Supreme Court has reiterated the standards of review for a federal habeas

12  court.  Estelle v. McGuire, 502 U.S. 62 (1991).  In Estelle v. McGuire, the Supreme Court

13  reversed the decision of the Court of Appeals for the Ninth Circuit, which had granted federal

14  habeas relief.  The Court held that the Ninth Circuit erred in concluding that the evidence was

15  incorrectly admitted under state law since, "it is not the province of a federal habeas court to

16  reexamine state court determinations on state law questions."  Id. at 67-68.  The Court re-

17  emphasized that "federal habeas corpus relief does not lie for error in state law."  Id. at 67, citing

18  Lewis v. Jeffers, 497 U.S. 764 (1990), and Pulley v. Harris, 465 U.S. 37, 41 (1984) (federal

19  courts may not grant habeas relief where the sole ground presented involves a perceived error of

20  state law, unless such error is so egregious as to amount to a violation of the Due Process or

21  Equal Protection clauses of the Fourteenth Amendment).

22         The Supreme Court further noted that the standard of review for a federal habeas

23  court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

24  the United States (citations omitted)."  Id. at 68.  The Court also stated that in order for error in

25  the state trial proceedings to reach the level of a due process violation, the error had to be one

26  involving "fundamental fairness," Id. at 73, and that "we 'have defined the category of

infractions that violate "fundamental fairness" very narrowly.'" Id.  Habeas review does not lie in a claim that the state court erroneously allowed or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

After reviewing the record, the undersigned cannot find the record relied on by the state appellate court in finding that Bradford's charges arose after the shootings.  However, in his petition for review filed in the California Supreme Court, petitioner does not dispute this finding. (See Respondent's Lodged Document7, at 7-17.)  In the instant action, petitioner also does not dispute this finding.  Evidence regarding Bradford's pending charges may be in documents submitted by co-defendant Adams in his state pleadings which are not part of this court's record. For these reasons, the undersigned finds that the finding by the California Court of Appeal that Bradford's charges occurred after the shootings is undisputed.

For the reasons stated by the California Court of Appeal, the undersigned finds that the trial court's ruling to exclude the evidence of Bradford's pending charges did not violate due process.  Because the charges arose after the shootings, as noted by the state appellate court, they shed little light on the reason for the shootings.  There was also no evidence that Bradford was engaging in the illegal conduct at the time of the shootings.  In any event, the charges had little probative value.  For these reasons, the trial court's decision to exclude evidence of these charges did not violate fundamental fairness.

For the reasons stated herein, the undersigned also finds that the trial court's decision to exclude evidence of Bradford's pending charges did not violate petitioner's right to present a defense.

Due process includes a criminal defendant's right to "a meaningful opportunity to present a complete defense."  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citation and internal quotations omitted).  Evidence of potential third-party culpability must be admitted when, under the "facts and circumstances" of the individual case, its exclusion would deprive the defendant of a fair trial.  Chambers v. Mississippi, 410 U.S. 284, 303 (1973).  The Court of Appeals for the

Ninth Circuit has determined that where the proffered evidence simply affords a possible ground of suspicion pointing to a third party and does not directly connect that person with the actual commission of the offense, that evidence may be excluded.  See People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)).  See also Lunbery v. Hornbeak, 605 F.3d 754, 760–61 (9th Cir. 2010) (exclusion of statement by third party that he had killed defendant's husband deprived defendant of the right to present a defense because the "excluded testimony ... bore substantial guarantees of trustworthiness and was critical to [defendant's] defense").

The trial court's ruling excluding this evidence did not violate petitioner's right to present a defense because the evidence of the pending charges did not directly connect Bradford to the shooting.

After conducting a review pursuant to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") set forth at 28 U.S.C. § 2254, the undersigned recommends that this claim be denied.

*Admission of Washington's Statement*

Petitioner argues that the trial court violated his right to due process by admitting Washington's statement that the shooting was gang-related and committed by the Nogales Crips. The California Court of Appeal denied this claim for the reasons stated herein:

> At trial, Officer Hoversten testified that on the night of the shooting, he had asked one of the victims, R.W., if he knew who had fired the shots. He said that R.W. replied that "it was probably the Nogales Crips because there had been a feud going on over the last few months between Nogales and Elm Street." The trial court instructed the jury that this statement was not offered for the truth of the matter asserted, but was admissible solely to help determine credibility issues.
>
> Defendants contend that R.W.'s statement should have been excluded as irrelevant, speculative and lacking foundation. Even if we were to agree with these claims, defendants cannot demonstrate prejudice.
>
> We presume that the jury followed the court's instructions and did

1
2
3
4
5

> not use R.W.'s statement in determining whether the shooting was gang related. (People v. Smith (2007) 40 Cal.4th 483, 517.) Moreover, the prosecution's gang expert testified at length about the ongoing war between the Nogales Gangster Crips and Elm Street Bloods that had already resulted in four drive-by shootings in the same neighborhood in the preceding four months. Given this evidence, any error in admitting R.W.'s statement to Officer Hoversten was harmless.

6   (Respondent's Lodged Document 6, at 6-7.)

7   The United States Supreme Court "has not yet made a clear ruling that admission

8   of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to

9   warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

10  Absent such a ruling from the Supreme Court, a federal habeas court cannot find the state court's

11  ruling was an "unreasonable application" of "clearly established federal law" under 28 U.S.C. §

12  2254(d)(1).  Id. (citing Carey v. Musladin, 549 U.S. 70, 77 (2006)).

13  Because petitioner argues that Washington's statements were irrelevant and

14  prejudicial, his challenge to admission of this evidence must be rejected as there is no clearly

15  established Supreme Court authority in support of this claim.  See Holley, 568 F.3d at 1101 n.2

16  (finding that, although trial court's admission of irrelevant and prejudicial evidence violated due

17  process under Ninth Circuit precedent, such admission was not contrary to, or an unreasonable

18  application of, "clearly established Federal law" under section 2254(d)(1), and therefore not

19  grounds for granting federal habeas relief).

20  Even if Holley did not supply the rule for this claim, the undersigned would find,

21  for the reasons stated by the California Court of Appeal, that admission of  Washington's

22  statements did not violate fundamental fairness.  The prosecution's gang expert's opinion that the

23  shooting was the result of an ongoing war between the Nogales Gangster Crips and Elm Street

24  Bloods was well supported.  In addition, the jury is presumed to have followed the instruction not

25  to use Washington's statement in determining whether the shooting was gang related.  See

26  Richardson v. Marsh, 481 U.S. 200, 211 (1987) (juries are presumed to follow their instructions).

1  The admission of Washington's statements regarding his belief as to why the shootings occurred

2  through the testimony of Officer Hoversten did not violate due process.

3          After conducting an AEDPA review, the undersigned recommends that this claim

4  be denied.

5          *Admission of Photograph*

6          Petitioner argues that the trial court violated his right to due process by admitting

7  a photograph of co-defendant Adams' tattoo.  The California Court of Appeal denied this claim

8  for the reasons stated herein:

9          Defendants contend that the trial court erred in admitting a
        photograph of one of defendant Adams's tattoos because its
10       prejudicial effect outweighed any probative value. We disagree.

11       The tattoo in question is located on defendant Adams's arm. It
        depicts a man, wearing a shirt marked "NC" and holding up a
12       semiautomatic firearm; shell casings are coming out of the firearm.

13       Defendants sought to exclude the photograph of this tattoo
        because, according to defendants, it associated defendants with
14       random violence and was overly prejudicial. The trial court
        rejected these concerns, ruling the tattoo was not "so inflammatory
15       or over the top when considered with the rest of the tattoos that Mr.
        Adams has." The court ruled that the tattoo was relevant on the
16       issues of intent, motive, and identity, and that its probative value
        outweighed any prejudicial effect.

17
        Defendants contend that this ruling was erroneous because the
18       photograph evoked "horror and revulsion," and should have been
        excluded. We disagree.
19
        Evidence of gang tattoos is admissible if its probative value
20       outweighs any potential for prejudice. (E.g., People v. Monterroso
        (2004) 34 Cal.4th 743, 773; People v. Ochoa (2001) 26 Cal.4th
21       398, 437-438.)

22       The trial court here noted that this tattoo was "a message
        [defendant Adams] intended to send," and was highly probative on
23       the issues of intent, motive and identity. Moreover, given that
        defendants sported other gang-related tattoos, this particular tattoo
24       was not "over the top." The trial court concluded that the probative
        value of this particular photograph outweighed any potential for
25       prejudice. That determination was well within its discretion. There
        was no error.

26

19

(Respondent's Lodged Document 6, at 7-8.)

Because petitioner argues that admission of the photograph was prejudicial, this claim must be denied pursuant to Holley, supra. Even if Holley were not applicable, the undersigned would find that admission of the photograph did not violate fundamental fairness. As noted by the California Court of Appeal, because petitioner and co-defendant Adams had other gang-related tattoos, this particular tattoo was not "over the top."

After conducting an AEDPA review, the undersigned recommends that this claim be denied.

B. Claim 2: Alleged Insufficient Evidence

*Legal Standard*

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First, the court considers the evidence at trial in the light most favorable to the prosecution. Id., citing Jackson, 443 U.S. at 319. "'[W]hen faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume-even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id., quoting Jackson, 443 U.S. at 326.

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id., quoting Jackson, 443 U.S. at 319. "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would

have to conclude that the evidence of guilt fails to establish every element of the crime beyond a

reasonable doubt."  Id.

Superimposed on these already stringent insufficiency standards is the AEDPA

requirement that even if a federal court were to initially find on its own that no reasonable jury

should have arrived at its conclusion, the federal court must also determine that the state

appellate court not have affirmed the verdict under the Jackson standard in the absence of an

unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

*Analysis*

Petitioner argues that there was insufficient evidence to support his gang

enhancement.  The California Court of Appeal denied this claim for the reasons stated herein:

> Section 186.22, subdivision (b)(1) provides for an enhanced prison
> sentence when a defendant commits a felony "for the benefit of, at
> the direction of, or in association with any criminal street gang,
> with the specific intent to promote, further, or assist in any criminal
> conduct by gang members[.]"  For purposes of this statute, a
> "criminal street gang" is defined as "any ongoing organization,
> association, or group of three or more persons, whether formal or
> informal, having as one of its primary activities the commission of
> one or more of [specified criminal activities], having a common
> name or common identifying sign or symbol, and whose members
> individually or collectively engage in or have engaged in a pattern
> of criminal gang activity." (§ 186.22, subd. (f).)

> Defendants assert there is insufficient evidence to establish certain
> of these elements. Specifically, they contend that there was no
> substantial evidence that the Nogales Gangster Crips had as "one
> of its primary activities" the commission of the requisite offenses.
> They also assert that there was no substantial evidence that the
> shooting was committed "for the benefit of, at the direction of, or
> in association with" the Nogales Gangster Crips, or that it was
> intended "to promote, further, or assist in any criminal conduct by
> gang members." None of these claims has merit.

> "The proper test for determining a claim of insufficiency of
> evidence in a criminal case is whether, on the entire record, a
> rational trier of fact could find the defendant guilty beyond a
> reasonable doubt. [Citations.] On appeal, we must view the
> evidence in the light most favorable to the People and must
> presume in support of the judgment the existence of every fact the
> trier could reasonably deduce from the evidence. [Citation.]

"Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the ... jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (People v. Jones (1990) 51 Cal.3d 294, 314.)

Defendants assert that there was insufficient evidence to establish that the Nogales Gangster Crips had one of the specified criminal acts as one of its "primary activities" and therefore the gang enhancements cannot stand.  We disagree.

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members."  (People v. Sengpadychith (2001) 26 Cal.4th 316, 323.)

Defendants contend that the only evidence relied upon by the prosecutor to establish primary activities was the description of two murders that occurred in 2002 and 2004. That is not the case. In addition to describing those acts, the gang expert also testified that the Nogales Gangster Crips and Elm Street Bloods had been involved in a war between January 2005 and April 2005, when this shooting occurred. This feud was sparked by the homicide of a Nogales Gangster Crips member and led to four drive-by shootings in a four-month period in this neighborhood. This evidence was sufficient to meet the "primary activity" requirement.

Defendants next contend that there was insufficient evidence to establish that the shooting was done "for the benefit of, at the direction of, or in association with any criminal street gang." However, as defendants also recognize, courts have held otherwise in the identical circumstances.

"The crucial element ... requires that the crime be committed (1) for the benefit of, (2) at the direction of, or (3) in association with a gang. Thus, the typical close case is one in which one gang member, acting alone, commits a crime. Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members." (People v. Morales (2003) 112 Cal.App.4th 1176, 1198; see also People v. Leon (2008) 161 Cal.App.4th 149, 163; People v. Martinez (2008) 158 Cal.App.4th 1324, 1332.)

We agree with that analysis. Here, defendants were both known members of the Nogales Gangster Crips and committed the drive-by shooting together, firing their weapons in front of a house known as the "secondary hang out for the Elm Street Bloods." Given the setting and the recent spate of shootings in this area, the jury could reasonably conclude that defendants acted in association with a criminal street gang. Defendants' claims to the contrary are not persuasive.

Finally, defendants contend that there was insufficient evidence to demonstrate that they intended "to promote, further, or assist in any criminal conduct by gang members." To the contrary. The gang expert testified that the Nogales Gangster Crips and Elm Street Bloods were feuding in this neighborhood; four other drive-by shootings had occurred in the preceding months. Defendants, known members of the Nogales Gangster Crips, committed this drive-by shooting in front of the house of a known member of the Elm Street Bloods. The gang expert testified that such a shooting, in the heart of enemy territory, was designed to demonstrate that the Nogales Gangster Crips were "not afraid to go into another rival's neighborhood to take care of what they intend[ed] to do or try to find someone or a target who they want to get.  It shows that they have no fear of Elm Street."

There was ample evidence to support the jury's determination that defendants had the requisite intent to support the gang enhancement allegations.

(Respondent's Lodged Document 6, at 8-12.)

In the instant petition, petitioner does not raise the claim that there was insufficient evidence that the Nogales Gangster Crips had as "one of its primary activities" the commission of the requisite offenses.  Petitioner argues that there was insufficient evidence that the shooting was committed "for the benefit of, at the direction of, or in association with" the Nogales Gangster Crips, or that it was intended "to promote, further, or assist in any criminal conduct by gang members."

For the reasons stated by the California Court of Appeal, the undersigned finds that there was sufficient evidence that petitioner committed the shootings "for the benefit of, at the direction of, or in association with any criminal street gang."  The evidence demonstrated that petitioner and Adams were members of the Nogales Gangster Crips.  The evidence demonstrated that petitioner and Adams committed the drive-by shooting together by firing their weapons in

23

1  front of a house known as the a hang out for Elm Street Bloods.  Based on this evidence,

2  combined with the prosecution's gang expert testimony that there was a "war" going on between

3  the Elm Street Bloods and the Nogales Gangster Crips, a reasonable jury could find that

4  petitioner committed the shootings for the benefit of, at the direction of, or in association with

5  the Nogales Street Crips.

6          For the reasons stated by the California Court of Appeal, the undersigned finds

7  that there was sufficient evidence that petitioner intended to "promote, further, or assist in any

8  criminal conduct by gang members."  Again, the prosecution's gang expert testified that the Elm

9  Street Bloods and the Nogales Street Crips were in a "war" which had been going on for several

10  months.  There had been four other drive-by shootings in the past several months.  Petitioner and

11  Adams committed their drive-by shooting in the front of a house of  known members of the Elm

12  Street Bloods.  The prosecution's gang expert testified that this shooting was designed to

13  demonstrate that the Nogales Street Crips were not afraid to go into the Elm Street Bloods'

14  territory.  Based on this evidence, a reasonable jury could find that petitioner committed the

15  shooting to promote, further or assist the Nogalas Street Crips.

16          After conducting an AEDPA review, the undersigned recommends that this claim

17  be denied.

18          C.  Claim 3: Ineffective Assistance of Counsel

19          *Legal Standard*

20          The test for demonstrating ineffective assistance of counsel is set forth in

21  Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

22  all the circumstances, counsel's performance fell below an objective standard of reasonableness.

23  466 U.S. at 688.  To this end, the petitioner must identify the acts or omissions that are alleged

24  not to have been the result of reasonable professional judgment.  Id. at 690.  The federal court

25  must then determine whether in light of all the circumstances, the identified acts or omissions

26  were outside the wide range of professional competent assistance.  Id.  "We strongly presume

1   that counsel's conduct was within the wide range of reasonable assistance, and that he exercised

2   acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d

3   695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689).

4           Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at

5   693. Prejudice is found where "there is a reasonable probability that, but for counsel's

6   unprofessional errors, the result of the proceeding would have been different." Id. at 694. A

7   reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

8           In extraordinary cases, ineffective assistance of counsel claims are evaluated

9   based on a fundamental fairness standard. Williams v. Taylor , 529 U.S. 362, 391-93 (2000)

10  (citing Lockhart v. Fretwell, 506 U.S. 364 (1993)).

11          *Analysis*

12          Petitioner argues that his trial counsel was ineffective for failing to object and to

13  request an admonition for the prosecutor's misconduct during his questioning of witnesses and

14  during closing argument. The California Court of Appeal denied this claim for the reasons stated

15  herein:

16          Ineffective Assistance of Counsel

17          Defendants assert their attorneys were ineffective in failing to
            object to remarks made by the prosecutor in his questioning of
18          witnesses and in his arguments to the jury. The underlying
            predicate for defendants' claim is missing: their attorneys were
19          under no obligation to object because no misconduct occurred.

20          "To secure reversal of a conviction for ineffective assistance of
            counsel, a defendant must establish that counsel's performance fell
21          below an objective standard of reasonableness and that, to a
            reasonable probability, defendant would have obtained a more
22          favorable result absent counsel's shortcomings." (People v. Kraft
            (2000) 23 Cal.4th 978, 1068.)

23
            At the preliminary hearing, three of the prosecution's witnesses
24          (including the two victims) testified that they knew B.B., a member
            of the Elm Street Bloods, and that the shooting occurred near
25          B.B.'s house. One of the witnesses described this area as a Blood
            gang area. However, when these witnesses testified at trial, they
26          denied knowing B.B. or where he lived, and also denied knowing

whether the shooting occurred in a Blood or Crips area. The prosecutor asked these witnesses if they were afraid of testifying and asked about the consequences of being labeled a snitch.

The prosecutor's gang expert testified that gang members instill fear in area residents, which results in difficulties in investigating gang-related crimes. Witnesses do not want to be labeled as "snitches" and are therefore reluctant to talk to police, obey a subpoena, or testify.

In his argument to the jury, the prosecutor stated that this testimony explained the behavior of the testifying witnesses and why D.B. "maybe didn't act the way that you would expect somebody who got shot for no reason to act when they come to court. [¶] They got to go back to where they live. They know what's happening. They know what's going on. They know the code."

The prosecutor contrasted gang cases with others in which witnesses appear in court willingly and describe what happened. He stated, "They may or may not be able to identify the person who did it. And they'll tell us. And it's clear that they're doing the best that they can to help everybody out in simply getting whatever information that's in their head out into evidence from the witness stand. [¶] Not gang cases. The moment the police show up it's a completely different world. And when it hits the Court system and finally we get a jury picked and finally we get these people to court, this is what we get. Doesn't matter.  Doesn't mean these crimes didn't happen."

Defendants contend that the prosecutor's questioning of witnesses and statements in closing argument amounted to unsworn testimony and was therefore improper. They assert that the failure of their attorneys to object to these remarks constituted ineffective assistance of counsel. There was no misconduct.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, . . . when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (People v. Morales (2001) 25 Cal.4th 34, 44.)

The questions posed to the witnesses did not involve any unfairness or deceptive practices. The prosecutor was entitled to ask the witnesses about their change of testimony, and these

1    questions were well within the proper scope of that inquiry.

2    "At closing argument a party is entitled both to discuss the
     evidence and to comment on reasonable inferences that may be
3    drawn therefrom." (People v. Morales, supra, 25 Cal.4th at p. 44.)
     However, a prosecutor may not refer to facts not in evidence and
4    suggest facts exist that are unsupported by the record. (People v.
     Hill (1998) 17 Cal.4th 800, 827-828.)
5
     The prosecutor's comments to the jury were appropriate remarks
6    given the gang expert's testimony, the victims' inconsistent
     testimony, and the victims' behavior in court. Contrary to
7    defendants' claims, the prosecutor's statements did not constitute
     unsworn testimony. They were simply comments on the evidence
8    and focused on the appropriate inferences that could be drawn.
     There is no likelihood that the jury misconstrued the prosecutor's
9    comments in any improper manner. (See People v. Clair (1992) 2
     Cal.4th 629, 663; People v. Adanandus (2007) 157 Cal.App.4th
10   496, 513-514.)

11   Because there was no misconduct, defendants' attorneys had no
     reason to object, and defendants' claims of ineffective assistance of
12   counsel necessarily fail.

13   (Respondent's Lodged Document 6, at 12-16.)

14        For the reasons stated by the California Court of Appeal, the undersigned finds

15   that petitioner's alleged ineffective assistance of counsel claim is without merit.  The

16   prosecutor's questioning of the witnesses regarding their changed testimony was not improper.

17   The prosecutor was allowed to ask the witnesses why the changed their testimony.  As noted by

18   the state appellate court, the prosecutor's argument regarding the reluctance of the victim's to

19   testify regarding what happened and their changed testimony was not inappropriate as it was

20   based on reasonable inferences from the evidence.  Objections by petitioner's counsel would not

21   have been upheld.

22        Additionally, the evidence against petitioner was strong.  It is unlikely that had

23   counsel successfully objected to the at-issue testimony and argument that the outcome of the trial

24   would have been different.

25        After conducting an AEDPA review, the undersigned recommends that this claim

26   be denied.

1       Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

2  a writ of habeas corpus be denied.

3       These findings and recommendations are submitted to the United States District

4  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

5  one days after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

8  objections, he shall also address whether a certificate of appealability should issue and, if so, why

9  and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

10  the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

11  2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

12  service of the objections.  The parties are advised that failure to file objections within the

13  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

14  F.2d 1153 (9th Cir. 1991).

15  DATED:  May 24, 2011

16

17  _Kendall J. Newman_

18  KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

19  trot996.157

20

21

22

23

24

25

26